[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

―――――――――――

No. 95-8672

―――――――――――

D. C. Docket No. 92-CV-230-3-MAC(WDO)


MARK LEE THORNTON, TOMMY CRAVEY,

                              Plaintiffs-Appellees,

                versus

THE CITY OF MACON, a Municipal Corporation,

                                        Defendant,

D. COLEMAN, J. LODGE,

                              Defendants-Appellants,

STANLEY HUNNICUTT,

                                        Defendant,

ZIVA BEDDINGFIELD,

                              Defendant-Appellant.


―――――――――――

Appeal from the United States District Court
for the Middle District of Georgia

―――――――――――

**(January 13, 1998)**


Before HATCHETT, Chief Judge, and TJOFLAT, Circuit Judge, and
GODBOLD,  Senior Circuit Judge.

PER CURIAM:

This case arises out of the arrests of Mark Thornton and Tommy Cravey by City of Macon police officers Stanley Hunnicutt, Desmond Coleman, Jhristian Lodge, and Ziva Beddingfield. Thornton and Cravey filed a complaint in the district court under 42 U.S.C. § 1983 (1994) alleging that, in accordance with the custom, practice, or policy of the City of Macon, the four police officers violated their rights under the Fourth and Fourteenth Amendments by arresting them without probable cause and by using excessive force to carry out those arrests. The complaint sought compensatory and punitive damages against each defendant.[1] The

---

[1] The complaint, a quintessential shotgun pleading, see, e.g., Morro v. City of Birmingham, 117 F.3d 508, 515 (11th Cir. 1997); Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 164 (11th Cir. 1997), was framed in two counts. Count One contained a variety of federal constitutional claims under the First, Fourth, and Fourteenth Amendments and, according to the plaintiffs' brief in opposition to the police officers' motion for summary judgment, the Fifth Amendment as well. Count One alleged that, in addition to the conduct described in the text, the following conduct on the part of the police officers violated the aforementioned constitutional provisions: (1) the entry and search of Thornton's residence without a search warrant, (2) the malicious prosecution of Thornton and Cravey, and (3) "unlawful trespass under color of state law." Although the plaintiffs contend that the defendants infringed their First Amendment rights, the complaint gives no hint as to which First Amendment rights were implicated or how the officers' or the City's conduct may have infringed such rights. Count Two combined two pendent tort claims against the officers and the City: one for false arrest and one for malicious prosecution. Although the allegations underpinning the false arrest claim are apparent, neither the complaint nor Count Two indicates what the officers or the City did to render them liable for the tort of malicious prosecution. (Because Count Two incorporated all of the preceding allegations of the complaint, including those of Count One, Count Two appears to have alleged that the City was

1

four police officers jointly moved the district court for summary

judgment on Thornton's and Cravey's claims on the ground that

they were entitled to qualified immunity.  The district court

denied the motion with respect to officers Coleman, Lodge, and

Beddingfield, but did not rule on the motion with respect to

officer Hunnicutt.[2]  Coleman, Lodge and Beddingfield then

---

liable because the officers' conduct was pursuant to City custom,
practice, or policy.)

  [2]  The record is puzzling with respect to the plaintiffs' case
against Officer Hunnicutt.  The district court's docket contains
a "Minute Sheet" for a pretrial conference that was held by the
district judge presiding over the case on November 4, 1993.  That
sheet bears the following entry: "Officer Hunnicutt is dismissed
from the case."  The record contains no further mention of
Hunnicutt until March 1, 1995.  On that date, the police
officers, including Hunnicutt, filed "Defendants' Motion for
Summary Judgment," which asserted that the officers were entitled
to summary judgment on their defense of qualified immunity.  That
defense, which appears as the fourth affirmative defense in the
officers' answer to the plaintiffs' complaint, asserts that "at
all times during the incidents referred to in the Plaintiffs'
Complaint, [the officers] were acting as sworn police officers
for the City of Macon . . . and as such have qualified immunity
from civil liability. . . ."  That is, the officers alleged that
they were immune from suit on all of the constitutional claims
presented in Count One of the complaint, see supra note 1.  The
court, however, in its order disposing of the qualified immunity
issue, only addressed the plaintiffs' Fourth and Fourteenth
Amendment claims of false arrest and excessive force, as
indicated in the text.  In this appeal, Officers Coleman, Lodge,
and Beddingfield do not complain of the court's failure to
consider whether they are entitled to qualified immunity on the
plaintiffs' First and Fifth Amendment Count One claims --
whatever they are -- or their claims for malicious prosecution.
They similarly do not contest the court's failure to consider
whether they are immune from suit on Thornton's claims for
"unlawful tresspass under color of law" and entry and search of
residence without a search warrant.  Officer Hunnicutt did not
appeal the district court's failure to rule on the question
whether he had qualified immunity with respect to any of the
plaintiffs' claims.  Whether Hunnicutt is still in the case and,
if so, to what extent he is entitled to qualified
immunity is a matter the district court must address in due

2

appealed.[3]

We have jurisdiction to consider an interlocutory appeal of an order denying a motion for summary judgment on qualified immunity grounds. See Johnson v. Jones, 515 U.S. 304, 310-14, 115 S.Ct. 2151, 2155-56, 132 L.Ed.2d 238 (1995). We review such orders de novo, and resolve all issues of material fact in favor of the plaintiff. See Cottrell v. Caldwell, 85 F.3d 1480, 1486 & n.3 (11th Cir. 1996). We then answer the legal question of whether the defendants are entitled to qualified immunity under that version of the facts. Id. Accordingly, in part I we state the facts of the case in the light most favorable to Thornton and Cravey. In part II, we explain why the officers are not entitled to qualified immunity on that version of the facts, and therefore were not entitled to summary judgment.

I.

Marjorie Mullis called the Macon city police department on

_____

course.

[3] In its order denying the defendants' motion for qualified immunity on Thornton's illegal arrest claim, the district court also granted Thornton's motion for summary judgment, holding that the defendants had failed to present sufficient evidence to create a material issue of fact on that claim. That disposition could have been reduced to a final judgment appealable under 28 U.S.C. § 1291 had the court directed the entry of judgment pursuant to Fed. R. Civ. P. 54(b). Because the court did not enter a Rule 54(b) judgment on Thornton's claim, we do not review its grant of Thornton's motion for summary judgment. We therefore review Thornton's illegal arrest claim only to determine whether the officers are entitled to summary judgment on the issue of qualified immunity.

3

June 5, 1990.  She explained to the dispatcher that she wanted the assistance of a police officer in resolving a dispute between Thornton and herself.  Mullis and Thornton had lived together in Thornton's apartment, but had parted ways over two years earlier.  Mullis explained that she had a set of keys to Thornton's car, which car she used periodically, and that Thornton wanted her to return those keys.  She had told Thornton that if she had to return the keys, then he would have to return a mattress that she had left in his apartment.  Mullis explained that she wanted an officer to assist her in exchanging the keys for the mattress.

Officer Coleman was dispatched to Mullis' residence.  Mullis explained the situation to Coleman and asked him to take the keys to Thornton.  Coleman agreed to do so and proceeded to Thornton's apartment, which was located across the street in the same block as Mullis' apartment.  When Coleman arrived, Thornton was standing on the front porch of his apartment, which was on the ground floor of the apartment house.[4]  Coleman explained to Thornton that he was there to return the keys and to pick up Mullis' mattress.  Thornton responded by telling Coleman that he had done nothing wrong and that he wanted Coleman to leave the premises.  At some point during this initial exchange, Mullis arrived on the scene.  Thornton became upset and entered his

---

[4]  Thornton's apartment was in an old house that his father owned.  The two-story house had been converted into four apartments, each of which had its own entrance to the outside: there was no common entrance or lobby.  Thornton's apartment was on the first floor and, when facing the building, was on the left hand side.  Thornton managed the property for his father.

apartment, closing a screen door behind him.  Once inside,
Thornton stood at the screen door and repeatedly told Coleman and
Mullis to leave.

Instead of leaving, Coleman called for backup.  Less than a
minute later, Officers Lodge and Beddingfield arrived on the
scene.  Coleman briefed them on the situation.  Thornton repeated
his desire that the officers leave.  The officers tried
unsuccessfully to get Thornton to come out on the porch and talk
to them.  Finally, they told him that if he opened the screen
door, they would give him his car keys.

As Thornton opened the door to get the keys, the officers
charged into the apartment.  One of the officers grabbed
Thornton's arms, and another grabbed Thornton around the neck.
The officers threw Thornton to the floor, cuffed his hands behind
his back, picked him up by his arms, dragged him outside and
shoved him into a police car.[5]

Cravey was an acquaintance of Thornton's and had been doing
some repair work on the apartment house.  When the officers
arrived, Cravey was sitting in a pickup truck parked in the
apartment house driveway; he had come to the house to check on
his brother Earl, who was working there that day.  While in the
truck, Cravey observed the officers arrest Thornton and put him
in the patrol car.  As the officers took Thornton to the car,
Thornton yelled to Cravey; he wanted Cravey to call his mother

---

[5]  The officers' respective roles in this scuffle are unclear
from the record on appeal.

and his lawyer and to lock his apartment.  Cravey got out of the truck and approached the officers to ask if he could enter the apartment to use the phone.  One of the officers responded by patting Cravey down; he found a pocket knife on Cravey's person.  The officer charged Cravey with "obstruction," slammed him down on the hood of a police car, and cuffed his hands behind his back.  The officer placed Cravey in the back seat of the police car with Thornton.

With Thornton and Cravey in the car, the officers directed Mullis to go into the apartment and get her mattress.  When Mullis hesitated, one of the officers told her that if she refused, she would be arrested.  Mullis explained that she had a bad back and could not lift the mattress.  The officers then helped her carry the mattress to the front porch, where they left it.  Thornton and Cravey were taken to jail and charged with felony obstruction of a law enforcement officer in violation of O.C.G.A. § 16-10-24 (1996).  The charges were later dismissed.

## II.

Coleman, Lodge, and Beddingfield contend that they are entitled to qualified immunity from Thornton and Cravey's false arrest claims.  A public official is entitled to qualified immunity from a § 1983 damages action if his actions did not violate clearly established law.  It is clearly established that an arrest made without probable cause violates the Fourth Amendment.  See Von Stein v. Brescher, 904 F.2d 572, 579 (11th

6

Cir. 1990).  An officer is entitled to qualified immunity where the officer had "arguable probable cause," that is, where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest" the plaintiffs.  Id. at 579 (internal quotation marks and citations omitted).

A.

Thornton was arrested for "obstruction of a law enforcement officer."  Under Georgia law, a person is guilty of obstruction when he "knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties."  O.C.G.A. § 16-10-24 (1996).  Even if we concluded that the officers had arguable probable cause to believe that Thornton obstructed or hindered them, the officers would not be entitled to qualified immunity because no reasonable officer would have believed that these officers were engaged in the lawful discharge of their official duties.

Officer Coleman was dispatched to Mullis' house to address a civil dispute, and had "the general duty"–and the authority–"to enforce the law and maintain the peace."  Duncan v. State, 163 Ga.App. 148, 148, 294 S.E.2d 365, 366 (Ga. App. 1982).  Coleman's and the other officers' actions here far exceeded that authority. Coleman lawfully could peaceably approach the front door of Thornton's apartment and attempt to deliver the keys and retrieve the mattress; in so doing he would merely be attempting to

7

mediate and defuse a contentious situation.  He and the other officers could not force Thornton to make such an exchange, however, and they could not remain on Thornton's property after Thornton had refused to make the exchange.  Thornton had committed no crime and had not threatened anyone; once he had asked the officers to leave, their continued presence-and their attempt to retrieve Mullis' mattress by force-was not pursuant to their official duties and was outside of their authority.  After that point, they were no longer maintaining the peace; they were instead merely attempting forcibly to resolve a civil dispute.  No reasonable police officer would have believed that the officers had probable cause to arrest Thornton for "obstruction" of such unauthorized actions.[6]

The officers assert that Animashaun v. State, 427 S.E.2d 532 (Ga. App. 1993), supports their argument that they had probable cause to arrest Thornton for obstruction.  That case involved a domestic dispute between a husband and a wife.  The wife had left the husband a few days earlier and, fearing a violent confrontation, she called for a police escort before returning to the marital home to gather a few belongings.  Id. at 533.  As

---

[6] Officer Lodge testified at his deposition that he thought that they were arresting Thornton for disorderly conduct, see O.C.G.A. § 16-11-39 (1996).  This contention is not supported by Thornton's arrest report, which indicates that obstruction was the only contemplated charge.  The jury reasonably could disbelieve that Lodge believed that they were arresting Thornton for disorderly conduct, and even if the jury believed Lodge, Lodge lacked arguable probable cause to support an arrest for disorderly conduct.

8

soon as the wife and police officer arrived at the couple's home, the husband rushed into the driveway and began threatening the wife and officer with physical violence. The husband then ran into the house and continued to threaten the officer and wife from a window. Id. at 533-34. The Georgia appellate court held that the officer had probable cause to arrest the husband. Id. at 535.

Animashaun does not support the police officers' argument that they had probable cause in this case. First, in Animashaun the police officer accompanied the wife to her own home, where she had the same right to be present as the husband. Second, the husband in Animashaun repeatedly threatened both the wife and the officer with physical violence. These two facts placed the officer well within his official authority. When the husband obstructed the officer's attempt to discharge his official duties, the officer had probable cause to arrest the husband for obstruction.

In this case, however, Mullis did not live with Thornton, and had no right to be on his property without his consent. In addition, there is no indication that Thornton ever threatened Mullis or any of the officers with physical violence. In short, Animashaun provides no support for the officers' argument that they had arguable probable cause to arrest Thornton.


B.

Similarly, the officers did not have "arguable probable

9

cause" to arrest Cravey. Cravey was charged with obstruction, and none of the officers suggests that Cravey committed any other crime. Even if we concluded that Cravey "obstructed" these officers, we could not conclude that they were engaged in the lawful discharge of their official duties. Rather, they were engaged in an unlawful arrest of Thornton. No reasonable officer could believe that probable cause existed to arrest Cravey for "obstruction" of that endeavor.

## II.

Thornton and Cravey also claim that the officers used excessive force in carrying out their arrests. It is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989); see also Cottrell, 85 F.3d at 1492. Whether the force used is reasonable turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872. An officer will be entitled to qualified immunity if his actions were "objectively reasonable" -- that is, if a reasonable officer in the same situation would have believed that the force used was not excessive. See Anderson v. Creighton, 483 U.S. 635, 107

10

S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The district court properly denied the officers' motions for summary judgment on these claims. Neither Thornton nor Cravey was suspected of having committed a serious crime, neither posed an immediate threat to anyone, and neither actively resisted arrest. Yet, on the facts viewed in the light most favorable to the plaintiff, the officers used force in arresting both Thornton and Cravey. The officers grabbed Thornton and wrestled him to the ground, and threw Cravey on the hood of one of the patrol cars before handcuffing him. Under the circumstances, the officers were not justified in using <u>any</u> force, and a reasonable officer thus would have recognized that the force used was excessive. Therefore, the district court properly denied the officers' motions for summary judgment.

Accordingly, the order of the district court denying the appellant police officers' motions for summary judgment is AFFIRMED.

11