[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 14, 2011
JOHN LEY
CLERK

No. 10-13820

_____

D.C. Docket No. 5:09-cv-00248-HL

SANDRA ROBERTS,

Plaintiff-Appellee,

versus

JASON SPIELMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 14, 2011)

Before HULL and BLACK, Circuit Judges and HUCK,[*] District Judge.

PER CURIAM:

Plaintiff Sandra Roberts brought this suit against Defendant Jason

Spielman, a deputy with the Peach County, Georgia Sheriff's office, under 42

_____

[*]Honorable Paul C. Huck, United States District Judge for the Southern District of
Florida, sitting by designation.

U.S.C. § 1983, alleging that Deputy Spielman violated her right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution. Deputy Spielman moved for summary judgment based on qualified immunity. The district court concluded that Deputy Spielman was not entitled to qualified immunity because he was acting outside the scope of his discretionary authority, and the district court therefore denied Deputy Spielman's motion for summary judgment. Deputy Spielman now appeals that order.[1] After oral argument and a thorough review of the record and the parties' briefs, we reverse the district court's order denying Deputy Spielman's motion for summary judgment on Roberts's § 1983 claim.

## I. BACKGROUND FACTS

"We review de novo the denial of a motion for summary judgment based on qualified immunity." Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the facts in the light most

---

[1]We have jurisdiction over this appeal under 28 U.S.C. § 1291 because "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985).

favorable to [Roberts], drawing all reasonable inferences in [her] favor." Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1324–25 (11th Cir. 2006).

These are the relevant facts, viewed in the light most favorable to Roberts. On March 19, 2009, Deputy Spielman responded to a call about a possible suicide attempt at Roberts's home. Upon arriving at the home, Deputy Spielman spoke with Roberts's former sister-in-law, Tracey Huckabee, who said that she had been trying to make contact with Roberts for an hour. Huckabee stated that Roberts lived alone and had a history of suicide attempts. Huckabee told Deputy Spielman that she feared that Roberts had committed suicide, because Roberts's truck was parked in the driveway and Huckabee could hear both televisions on inside the residence. Huckabee also told Deputy Spielman that Roberts was on medication for bipolar disorder.

Deputy Spielman knocked several times on the front door and the bedroom window. When there was no response, he went to the kitchen door and knocked again more loudly. He then walked to the back of the home and onto the back deck, where he knocked on the back door several times. From the back door, Deputy Spielman heard the television on inside the home. Deputy Spielman opened the back door by pushing it open a few inches, allowing him to look inside the home. Roberts, who had been ignoring the knocking, believing it to be

3

Huckabee, heard the back door opening and saw Deputy Spielman's hair through the slightly open door. She asked him to identify himself and he stated he was with the Sheriff's office. Roberts approached Deputy Spielman, who was still on the back deck, and told him to "get the f*** out of here" in a forcible way. Roberts agrees this is what she clearly and forcibly said to Deputy Spielman. Roberts also does not dispute that she was verbally abusive to Deputy Spielman, repeatedly calling Deputy Spielman "boy" and yelling "get the f--- out of my house." Deputy Spielman told Roberts to go outside and talk to Huckabee. Roberts responded that she did not want to talk to Huckabee, and that Deputy Spielman could not make her leave the house.

When Deputy Spielman told Roberts to calm down and stop calling him boy, Roberts yelled "Get the f--- out of my house or I will–."[2] Deputy Spielman immediately grabbed Roberts's right arm and escorted her out of the house.

---

[2]Deputy Spielman avers that when Roberts said this, she suddenly turned back into the home and that he became concerned that Roberts might try to get a weapon. Roberts denies turning back into the home and states that when she made her "or I will–" statement, she meant that she "was near [her] telephone and was going to call the Sheriff's Department." However, Roberts does not allege that Deputy Spielman knew this. In any event, we do not rely on Roberts's turning back into the residence because Roberts disputes it. Rather, we rely on the 911 call, what Huckabee told Deputy Spielman when he arrived and what Roberts says (or does not dispute) happened after she saw Deputy Spielman.

4

Roberts estimated that from the time Deputy Spielman saw her at the back door until he grabbed her arm about five minutes elapsed.[3]

Deputy Spielman took Roberts across the back deck, into the garage, and made her sit down on the back steps. At this point, Huckabee also came to the back of the home. Deputy Spielman explained to Roberts that the reason for his presence was to perform a welfare check at her home. Roberts yelled profanities at Deputy Spielman and Huckabee. Eventually Deputy Spielman walked with Huckabee back around the house to the front driveway, leaving Roberts on the back steps. Roberts then walked back through the house to the front driveway, where she told Huckabee to "tear up the Constitution," because Deputy Spielman "had proven it means nothing anymore." Deputy Spielman shouted that he was "in charge," and told Roberts to "shut up or be arrested." Deputy Spielman told Huckabee that he could not take Roberts into custody for an evaluation because Roberts "did not verbally threaten her life in [his] presence." Deputy Spielman then left Roberts's home.

## II. DISCRETIONARY AUTHORITY

---

[3]Although Roberts states Deputy Spielman "grabbed" her right arm, she does not allege any resulting bruises, pain or injuries. She does not make an excessive force claim but an illegal search and seizure claim under the Fourth Amendment. At no time was Roberts handcuffed, restrained or placed in a police car. Deputy Spielman was performing a welfare check on Roberts and did not attempt an arrest.

We first conclude that the district court erred in holding that Deputy Spielman did not act within his discretionary authority. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988) (quotation marks omitted). "We thus interpreted the term 'discretionary authority' to include all actions of a governmental official that (1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting Rich, 841 F.2d at 1564).

The facts viewed in the light most favorable to Roberts reveal objective circumstances which compel us to conclude that Deputy Spielman's actions were undertaken pursuant to the performance of his duties and were within the scope of his authority. First, Deputy Spielman acted pursuant to the performance of his

6

duties. Under Georgia law, a peace officer's duties include "the protection of life." O.C.G.A. § 35-8-2(8)(A). Deputy Spielman's actions at issue in this case were all taken pursuant to his check on Roberts's welfare following a report that she may have attempted suicide.

Second, Deputy Spielman's actions were within the scope of his authority. The district court determined, and Roberts appears to argue on appeal, that viewing the facts in the light most favorable to Roberts, Deputy Spielman exceeded the scope of his authority when he remained on Roberts's property after he saw that she was alive and she asked him to leave. We do not agree. Deputy Spielman acted within his authority in remaining on the property and attempting to speak with and observe Roberts for a brief period of time to ensure that she had not attempted, nor was about to attempt, suicide. See Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (concluding that "it is clear that [an off-duty sheriff's deputy] was acting within the scope of his discretionary authority when he intervened in [a pedestrian's] apparent suicide attempt").

Thornton v. City of Macon, 132 F.3d 1395 (11th Cir. 1998), does not aid Roberts's case. In that case, Marjorie Mullis, who previously lived with Thornton, asked the police to go to Thornton's apartment to help her give her keys to

Thornton in return for his giving her mattress in the apartment back to her. A Macon police officer arrived at Thornton's and told Thornton he was there to return the keys and pick up Mullis's mattress. Thornton was on his porch and told the officer to leave the premises. Thornton went inside and closed the screen door behind him. The officer did not leave, and Thornton stood at the screen door and repeatedly told the officer and Mullis to leave.

Ultimately, the officer called for back-up and law enforcement officers forced Thornton to exchange personal property with his ex-roommate Mullis even though Thornton refused to make the exchange. Id. at 1397-99. We explained that "Thornton had committed no crime and had not threatened anyone; once he had asked the officers to leave, their continued presence—and their attempt to retrieve [his ex-roommate's] mattress by force—was not pursuant to their official duties and was outside of their authority." Id. at 1399. The officers in Thornton "were no longer maintaining the peace; they were instead merely attempting forcibly to resolve a civil dispute." Id. But that is not the situation here. Deputy Spielman was still acting pursuant to his official duty to protect life, and was within his authority in carrying out that duty, when he grabbed Roberts and briefly removed her from the house to speak with and observe her to ensure that she was not suicidal.

8

## III. VIOLATION OF A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT

After an initial inquiry as to whether the defendant was acting in his discretionary authority when the alleged acts occurred, we consider: (1) "[i]f the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated"; and (2) "whether the right violated was 'clearly established.'" Grider v. City of Auburn, 618 F.3d 1240, 1254 & n.19 (11th Cir. 2010). "Both elements of this test must be satisfied for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed appropriate for the case." Id.; see also Pearson v. Callahan, 555 U.S. 223, ___, 129 S. Ct. 808, 815-16 (2009).

"In determining whether a constitutional right was clearly established at the time of violation, the relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Grider, 618 F.3d at 1266-67 (quotation marks and ellipsis omitted); see also Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002). We must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004) (quotation marks omitted).

The Fourth Amendment protects people from unreasonable searches and seizures. U.S. Const. amend. IV. For Fourth Amendment purposes, a seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). An encounter between a police officer and a citizen becomes a seizure when "a reasonable person would not feel free to terminate the encounter." United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) (quotation marks omitted). When an officer stops an individual to ascertain that person's mental state (rather than to investigate suspected criminal activity), the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others. See, e.g., Cloaninger ex rel. Cloaninger v. McDevitt, 555 F.3d 324, 334 (4th Cir. 2009) (involving officer's "welfare check" at residence after doctor's 911 call reported possible suicide attempt); Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997) (involving officer dispatched to residence after mental health worker reported a suicide attempt).

The Fourth Amendment also prohibits warrantless searches of a person's home. United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002). This prohibition is not absolute, however. Id. One exception to the warrant

10

requirement "is that the police may enter a private premises and conduct a search if 'exigent circumstances' mandate immediate action." Id. "[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception." Id. at 1337; id. at 1335 ("The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life."); see also Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978)).

For this exception to apply, the officer must have both exigent circumstances and probable cause. Holloway, 290 F.3d at 1337. When officers respond to an emergency, "the probable cause element may be satisfied where officers reasonably believe a person is in danger." Id. at 1338. The officer's conduct is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." Id. at 1339 (quotation marks omitted). In addition, the officer's "warrantless search must be strictly circumscribed by the exigencies which justify its initiation . . . ." Mincey, 437 U.S. at 393, 98 S. Ct. at 2413 (quotation marks omitted).

Roberts appears to argue that once Deputy Spielman saw that she was alive, there was no longer any exigency sufficient to justify his continued presence on

her property or his seizure of her person. However, under the circumstances Deputy Spielman confronted, it was objectively reasonable for him to believe that Roberts might still be in need of immediate aid even though she was alive. See Monday, 118 F.3d at 1102 (stating that "a showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." (quotation marks omitted)).

Deputy Spielman was dispatched in response to a 911 call for a possible suicide attempt. At the residence, Huckabee, the relative who had placed the 911 call, told Deputy Spielman that Roberts's truck was in the driveway and her television was on, but Huckabee had been unable to get a response from Roberts for an hour. Huckabee also explained that Roberts suffered from bipolar disorder and had a history of suicide attempts. There is nothing in the record to suggest Deputy Spielman should have doubted the information Huckabee gave him.

Although Deputy Spielman knocked repeatedly and loudly at several doors and windows of the residence, Roberts did not respond, prompting Deputy Spielman to open the door a crack, call out to Roberts and look around. Given Roberts's belligerent behavior when Deputy Spielman opened the door and identified himself, and in light of what Huckabee had told him, Deputy Spielman

could reasonably have believed that Roberts posed a danger to herself that justified his remaining inside the doorway of her home for about five minutes and then, for safety reasons, briefly removing her from the home while he tried to calm her down and determine her mental state.

We stress the limited scope of Deputy Spielman's entry into the home and encounter with Roberts. Deputy Spielman opened the door and then stood in the doorway of Roberts' home for about five minutes while he spoke with her. Deputy Spielman then escorted Roberts outside to the back steps of her garage, but only after she continued yelling and made her ambiguous "or I will–"statement that a reasonable officer could have interpreted as a threat or at least as further cause for concern about Roberts's mental state. Although the record is silent as to precisely how long Deputy Spielman spoke with Roberts as she sat on the steps, it does not appear to have been a very long time.

When Deputy Spielman determined that Roberts was not threatening suicide, he determined that there was no longer an exigency justifying further action, and he left the property. We conclude that, under the particular factual circumstances of this case, Deputy Spielman's conduct did not violate the Fourth Amendment, and he is therefore entitled to qualified immunity. Furthermore, even assuming <u>arguendo</u> a constitutional violation, a reasonable officer in Deputy

13

Spielman's shoes would not have known that his conduct was unlawful. Roberts

has cited no binding precedent that clearly established that probable cause and

exigent circumstances immediately evaporate once an officer performing a welfare

check for a possibly suicidal person sees that the person is merely alive.

For these reasons, we **REVERSE** the district court's order denying Deputy

Spielman's motion for summary judgment on Roberts's § 1983 claim, and we

**REMAND** this case to the district court for entry of judgment in favor of Jason

Spielman on Roberts's § 1983 claim and for further proceedings.[4]

**REVERSED.**

---

[4]Roberts also brought claims under the Georgia Constitution and state law, but these claims were not the subject of the parties' cross-motions for summary judgment, and are not at issue in this appeal. For this reason, we must remand the case to the district court for further proceedings.