[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10357

Non-Argument Calendar

_____

JAMES R. LEACH,

Plaintiff-Appellant,

*versus*

SARASOTA COUNTY, et al.,

Defendants,

SARASOTA COUNTY SHERIFF,
ANTHONY ALLPORT,
KYLE POINSETT,
LORI BETH CLARK,
KARLA SMALL,

Deputy Sheriffs, et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-00330-CEH-CPT

_____

Before BRASHER, ABUDU, and HULL, Circuit Judges.

PER CURIAM:

James Leach, proceeding *pro se*, appeals the district court's (1) grant of summary judgment in favor of the Sarasota County Sheriff and several Deputy Sheriffs on Leach's claims under 42 U.S.C. § 1983, (2) dismissal without prejudice of his state law claims, and (3) denial of his motions to reconsider. After careful review, we affirm.

## I.    FACTS

Because Leach was the non-moving party at summary judgment, we view the evidence in the light most favorable to him and draw all reasonable inferences in his favor. *See Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1133-34 (11th Cir. 2018). However, we accept the defendants' factual assertions where they are based on undisputed evidence and have not been contradicted

by Leach.  *See Singletary v. Vargas*, 804 F.3d 1174, 1176 n.2 (11th Cir. 2015).

## A.    Initial Contact with Leach

Leach's claims stem from his arrest on February 7, 2017, while he was living with his mother, Marie Weatherwalks.  After a dispute with Leach, Weatherwalks called the police.  Before police responded, Leach left his mother's house in a van and drove to purchase a soda.

Deputies Lori Clark and Anthony Allport (in separate police cars) responded to the domestic disturbance call at Weatherwalks's house.  After speaking with Weatherwalks, Clark determined no crime occurred and no threat of future violence existed as Leach was not present.  Clark and Allport returned to their cars, parked in Weatherwalks's driveway.

To write a police report, Deputy Clark (1) ran a driver's license check on Leach and saw Leach's driver's license photo, (2) learned Leach was the registered owner of a white van, and (3) discovered Leach had a suspended driver's license and three prior convictions for driving while license suspended ("DWLS").  Clark then saw a white van drive past Weatherwalks's house and identified Leach as the driver.  Because Leach was driving, had a suspended driver's license, and had three prior DWLS convictions, Clark believed Leach could be arrested for felony DWLS.

Leach does not dispute that the Deputies saw him driving his van past Weatherwalks's house.  When Leach returned from

purchasing a soda, he saw two police cars parked outside and drove past Weatherwalks's house.

## B.    Disputed Traffic Stop Attempt

What happened next is disputed.  Deputies Clark and Allport testified that they followed Leach in his van and attempted a traffic stop, but Leach returned to Weatherwalks's house and went inside.

Leach denied that any police cars attempted a traffic stop on his van.  Instead, Leach stated (1) when he first returned to Weatherwalks's house, he saw two police cars outside and continued driving, and (2) when he returned to Weatherwalks's house the second time, the police cars were gone, and he went inside.  Leach stated that, after going inside, he took a 57-second cell phone video showing no police cars parked outside.

Regardless, at some point the Deputies returned to the house, and Leach went inside.  Then Deputy Karla Small arrived. Clark and Allport told Small that they were going to arrest Leach for felony DWLS.

## C.    Leach's Arrest

Deputies Clark, Allport, and Small entered Weatherwalks's house, and Leach was seated in a chair in the living room.  The Deputies informed Leach that he was under arrest for felony DWLS and attempted to handcuff him.  Leach resisted the Deputies by refusing to get out of his chair and to be handcuffed, stiffening his body and arms, spinning his body, pulling his hand

away, clenching his fists, and saying he was "not going back to jail."

Ultimately, Deputy Small was able to put one handcuff on Leach's left wrist, but Leach continued to resist by pulling his arms away. Allport attempted to handcuff Leach's right hand by grabbing Leach's right wrist, but Leach pulled away and twisted his body. For context, Leach stood 5 feet 11 inches tall and weighed between 240-249 pounds. Small stood 5 feet 2 inches tall and weighed between 120-129 pounds. Allport stood 5 feet 8 inches tall and weighed between 170-179 pounds.[1]

Small gave several verbal warnings that Leach would be tased if he continued resisting, but Leach did not comply, and Small claimed she tased Leach once while he was still standing. The taser expelled two probes and ran for one 5-second cycle. Small then handcuffed Leach using two separate sets of handcuffs. After being handcuffed, Leach continued to "roll and pull away" from the Deputies.

A photograph in the record shows Leach lying face down on the ground with two sets of handcuffs behind his back. One cuff of the first pair of handcuffs is attached to Leach's left arm, one cuff of the second pair of handcuffs is attached to Leach's right arm, and the remaining cuffs of the two pairs are connected to each other, making the space between Leach's hands/arms bigger and wider. Leach's arms are thus slightly bent and are

---

[1] The record does not contain Clark's height and weight.

about shoulder-width apart.   Allport stated that Deputies sometimes use two sets of intertwined handcuffs "as a courtesy for bigger, wider shouldered persons so we don't hurt their shoulders."   The Deputies testified that Leach did not inform them that he had a metal plate in his right arm.

After the taser was deployed, Deputies Kyle Poinsett and Kyle Collison arrived at Weatherwalks's house.   Small and Collison escorted Leach to a police car, but Leach resisted by refusing to support his body weight, which required the Deputies to pick up and carry Leach by his arms.   Leach "made every effort using his legs to avoid being placed into the patrol car.  It took two larger deputies to put [Leach] inside the back seat."   Leach was charged with "3rd or Subsequent DWLS" and two counts of resisting without violence.

Relevantly, Leach did not dispute that he refused to get out of his chair, resisted the Deputies throughout his arrest, was warned by Small that he would be tased if he failed to comply, and was ultimately tased once for his continued resistance.  As a result, we take these facts as true.  *See Singletary*, 804 F.3d at 1176 n.2.

However, Leach's affidavit to some extent disputed the Deputies' version of events.  Leach's affidavit describes the use of force as follows:

> Allport extracted me from my chair and forced me to the floor.  This action caused a great impact and laceration to my right elbow.  Allport along with the

23-10357                Opinion of the Court                7

> other deputy tried to force my right arm straight.  I
> told them about the metal plate in my arm and said
> my arm does not straighten.  I asked them to stop
> but the deputies laughed and continued.
>
> One deputy kneed me in the small of my back that
> [caused] shock waves of pain.  Small tasered me as I
> was lying down on the floor in handcuffs.[2]

Leach's affidavit thus disputes two important facts: (1) Leach told the Deputies about the metal plate in his right arm and that his arm could not straighten; and (2) Small tased Leach while he was in handcuffs already on the ground, not while he was standing. Because Leach disputes the Deputies' account as to these two facts, we accept Leach's version as true.  *See id.*  And it is these two actions that Leach on appeal contends were excessive force: (1) the Deputies "repeatedly straighten[ed] his surgically repaired right arm"; and (2) Deputy Small tased Leach while he was lying on the floor in handcuffs.

As to Leach's injuries from his arrest on February 7, 2017, the record contains three photographs (dated February 10, 2017) showing a small cut and bruise on Leach's right wrist, a small cut and bump on his right elbow, and marks on his back left by the

---

[2] There is no sworn complaint or deposition of Leach; only Leach's two-page affidavit.   Much of Leach's affidavit is about his interaction with Weatherwalks before the Deputies arrived and the disputed traffic stop attempt.  [*See id.*]  We quote in full the part of Leach's affidavit about the Deputies' force.

taser.  The injuries shown in the photographs are neither serious nor severe.

Leach also submitted two pages of medical records.  The first page is a medical record dated September 6, 2019, two years later, indicating Leach had surgery to remove the plate from his right elbow.  Nothing in this one record refers to Leach's arrest, and the plate was already in his elbow before the arrest.  The second page is a doctor's note from a January 16, 2020 visit, which recommends that Leach have "arthroscopic rotator cuff repair" to his right shoulder.  That page, however, states "not specified as traumatic."[3]  And it recommends repair but does not state Leach had the repair.

Indeed, the district court did not consider Leach's two medical records because it found "those records discuss medical conditions only generally and do not link the medical conditions to his arrest."  On appeal, Leach does not specifically challenge this ruling that his evidence did not connect these medical conditions to his arrest.

---

[3] Leach submitted a document titled "Unsigned Draft Confidential Work Product | Expert Witness Report."  The Report's cover page indicates Leach needed to pay a fee to "obtain the Name, CV, and/or a Signed Report of the Expert Witness."  In his summary judgment response, Leach stated that "he financially is unable to pay for the signed medical opinion."  The district court correctly declined to consider this unsigned draft Report, as it was unauthenticated and unsworn.  *See Dixon v. Univ. of Mia.*, 75 F.4th 1204, 1212 (11th Cir. 2023) ("Unsworn reports may not be taken into account by a district court when it rules on a motion for summary judgment.").

## II.          PROCEDURAL HISTORY

### A.          Fourth Amended Complaint

In the operative fourth amended complaint, Leach brought federal and state law claims against Sarasota County Sheriff Kurt Hoffman,[4] Deputy Sheriffs Clark, Small, Allport, Poinsett, Collison, and Sergeant Matt Tuggle (collectively "defendants"). Among other claims, Leach brought (1) excessive force claims against Deputies Allport, Clark, and Small; and (2) several claims against the Sheriff in his official capacity related to his policies or customs.[5]

### B.          Summary Judgment

The defendants filed a motion for summary judgment, which the court granted. The district court (1) found the Deputies and Sergeant Tuggle were entitled to qualified immunity on Leach's federal § 1983 claims, (2) determined Leach's claims against the Sheriff failed because he did not present evidence of a policy or custom, or that any policy or custom played a part in violating federal law or Leach's constitutional

---

[4] Leach originally sued Sarasota County Sheriff Thomas Knight. The district court took judicial notice that Kurt Hoffman became the Sarasota County Sheriff on January 5, 2021, and pursuant to Federal Rule of Civil Procedure 25(d), Hoffman was automatically substituted for Knight on all official capacity claims against the Sheriff.

[5] Leach also brought claims against the Sarasota County Commissioners, but he dismissed all of those claims prior to summary judgment, and they are not at issue in this appeal.

rights, and (3) declined to exercise supplemental jurisdiction over Leach's state law claims.

## C.    Rule 59(e) Motions for Reconsideration

Leach filed a motion for reconsideration, a supplement to that motion, and an amended motion for reconsideration. Attached to Leach's motions was a "transaction archive report" that detailed the Deputies' use of "the DAVID system" to run Leach's driver's license.  Leach admitted though that he "withheld this evidence in the MSJ proceeding for impeachment evidence at trial" because he "believed that his affidavit was enough to defeat summary judgment."

Leach's motions also described a cell phone video he purportedly took shortly before his arrest, but the video itself is not part of the record.  In any event, the video described by Leach is about the purported traffic stop before the officers came inside the house.

The district court denied Leach's motions for reconsideration.

### III.    STANDARDS OF REVIEW

We review *de novo* the district court's grant of summary judgment.  *Crane*, 898 F.3d at 1133.  We review for abuse of discretion the denial of a Federal Rule of Civil Procedure 59(e) motion for reconsideration.  *Samara v. Taylor*, 38 F.4th 141, 149 (11th Cir. 2022).

## IV.    SUMMARY JUDGMENT

### A.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007) (quotation marks omitted). If an official's challenged conduct was within the scope of his discretionary authority, the plaintiff must establish that the official is not entitled to qualified immunity by showing both (1) the official's conduct violated a constitutional right, and (2) that constitutional right was clearly established at the time of the official's conduct. *Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011). We may address either issue first, but the official is entitled to qualified immunity unless the plaintiff meets his burden as to both issues. *Id.*

"[T]he right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof, and the typical arrest involves some force and injury." *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (quotation marks omitted). As a result, the use of de minimis force, without more, will not support an excessive force claim. *See Baxter v. Roberts*, 54 F.4th 1241, 1269 (11th Cir. 2022); *Saunders v. Duke*, 766 F.3d 1262, 1269 (11th Cir. 2014); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003); *Nolin v. Isbell*, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000).

In analyzing whether a particular use of force was excessive, we consider several factors, including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, (3) whether the suspect was actively resisting or attempting to evade arrest, (4) the relationship between the need for force and the amount used, and (5) the extent of the suspect's injuries. *Sebastian*, 918 F.3d at 1308. "Because this standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in the officer's position to conclude the force was unlawful." *Id.* (quotation marks omitted and alteration adopted).

We first examine Leach's excessive force claims.

## B.    Excessive Force Claims against Clark, Allport, and Small

On appeal, Leach's brief asserts that Deputies Clark, Allport, and Small violated his constitutional rights by (1) holding him down and "repeatedly straighten[ing] his surgically repaired right arm then tasing him while in hand cuffs[,] lying on the floor," and (2) the Deputies' use of force was excessive because "the only purported justification for the officers' use of [that] force was that Mr. Leach supposedly resisted when defendants forced Mr. Leach's surgically repaired right arm beyond its limit."

To begin, the Deputies were entitled to use some degree of force because they had at least arguable probable cause to arrest Leach for felony DWLS. In 2017, the elements for felony DWLS under Florida law were (1) license suspension, (2) knowledge of

license suspension, (3) the defendant drove, and (4) the defendant had two or more prior DWLS convictions. *See Stringfield v. State*, 254 So. 3d 1127, 1128 (Fla. Dist. Ct. App. 2018) (interpreting Fla. Stat. § 322.34(2)(c) (2016)). It is undisputed that Clark saw Leach driving his van, Leach's license was suspended, and Leach had three DWLS convictions. A reasonable officer in the same circumstances and with that knowledge could have believed probable cause existed to arrest Leach.[6] Further, it is undisputed that Leach resisted and obstructed his arrest by refusing to get out of his chair, refusing to be handcuffed, stiffening his arms, and pulling his hand away. In these circumstances, the force used in pulling Leach from his chair to the floor to arrest him was de minimis and not excessive. *See Baxter*, 54 F.4th at 1269; *Durruthy*, 351 F.3d at 1094; *Nolin*, 207 F.3d at 1258 n.4.

Next, the Deputies' force in handcuffing Leach was not excessive. In general, painful handcuffing, without more, is also not excessive force where minimal injuries result. *See Gold v. City of Mia.*, 121 F.3d 1442, 1446-47 (11th Cir. 1997) (holding no excessive force where suspect was handcuffed for roughly twenty

---

[6] Leach argues it was disputed whether he personally knew his license was suspended. Leach's three DWLS convictions would have suggested to a reasonable police officer that Leach knew his license was suspended. In any event, while knowledge of a suspended license is one element of felony DWLS, *see* Fla. Stat. § 332.34(2)(c) (2016), "[s]howing arguable probable cause does not . . . require proving every element of a crime," *see Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010).

minutes and suffered only skin abrasions for which he did not seek medical treatment).

Still, the force used in handcuffing a suspect can be excessive under certain circumstances. For instance, this Court held an officer was not entitled to qualified immunity where he intentionally applied unnecessarily tight handcuffs to a *non-resisting* arrestee for more than five hours, which resulted in nerve damage and the permanent loss of sensation in the suspect's hands and wrists. *Sebastian*, 918 F.3d at 1304-05. This Court also held that an officer used excessive force in handcuffing a previously resistant suspect where the officer put his knee on the back of the *now-docile* suspect, moved the suspect's forearm to an uncomfortable position, "and then with a grunt and a blow" broke the suspect's arm. *Smith v. Mattox*, 127 F.3d 1416, 1418 (11th Cir. 1997). And this Court held that an officer's use of force was excessive where a compliant, handcuffed, and *non-resisting* suspect informed the officer of his bad shoulder and the officer intentionally applied stress to the shoulder on three separate occasions to inflict pain. *Davis v. Williams*, 451 F.3d 759, 767-68 (11th Cir. 2006).

Here, however, unlike *Davis*, there is no evidence indicating the Deputies targeted Leach's right elbow to inflict pain. *See Davis*, 451 F.3d at 767-68. If anything, the evidence shows the Deputies used two sets of intertwined handcuffs that allowed a wider and bigger space between Leach's arms. And unlike the compliant, non-resisting suspects in *Davis* and *Sebastian*, it is

undisputed that Leach continued to resist the Deputies throughout his arrest, even after handcuffed. *See id*; *Sebastian*, 918 F.3d at 1304-05.

Several excessive force factors tip the scale in the Deputies' favor: (1) Leach actively resisted the Deputies throughout his arrest; (2) Leach's protracted struggle and refusal to be handcuffed at least somewhat posed a danger to the Deputies, especially where his resistance was accompanied by his statement that he was "not going back to jail"; and (3) the level of force used to handcuff Leach was proportionate to the need to use that force, given that Leach's resistance required the Deputies to use at least some force on his right arm to handcuff him. *See Sebastian*, 918 F.3d at 1308. The photographs show a small cut and bruise on his right wrist and a small cut and bump on his elbow, which are consistent with the struggle that ensued to handcuff Leach after he refused to get out of his chair to be arrested.

We must, of course, also take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). At bottom, even though Leach informed the Deputies that his right elbow had a metal plate, we cannot say that every reasonable officer in the Deputies' position would inevitably conclude that it was unlawful and excessive to handcuff Leach using two separate sets of handcuffs (that made the space between Leach's hands

actually bigger and wider), given Leach actively resisted his arrest and refused to be handcuffed.  *See Sebastian*, 918 F.3d at 1308.

Additionally, Small's single use of a taser was not excessive. "[T]he use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force."  *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) (quotation marks omitted).  In these circumstances, "use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer."  *Id.* (quotation marks omitted).  For instance, this Court held that an officer was entitled to qualified immunity for using a taser to subdue a handcuffed suspect where the officer reasonably believed that the suspect, "who ha[d] repeatedly ignored police instructions and continue[d] to act belligerently toward police," was spitting blood on the officer. *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008); *see also Charles v. Johnson*, 18 F.4th 686, 701 (11th Cir. 2021) (holding it was not excessive to use a taser "once, for not more than five seconds," where the suspect resisted by "pulling his arms and body away from" an officer, screamed at the officer, and attempted to stand up after being ordered to remain down).

However, "unprovoked taser use against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment."  *Smith*, 834 F.3d at 1294 (quotation marks omitted); *see also Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) ("We

have held a number of times that severe force applied *after* the suspect is safely in custody is excessive.").

Viewing the facts in the light most favorable to Leach, as described above, he was handcuffed on the floor when tased, not standing as the Deputies stated. Even though handcuffed on the floor, Leach does not deny that he was still resisting arrest and pulling away from the Deputies when Small tased him once for not more than five seconds. Thus, we cannot say that Leach was "safely in custody" at that point, such that the single use of a taser was excessive. *See Mobley*, 783 F.3d at 1356; *Charles*, 18 F.4th at 701.

In fact, it is undisputed that Leach continued to resist the Deputies throughout the arrest and was given verbal warnings that he would be tased if he did not comply. As we recently noted, "an officer may lawfully use force against a suspect who never submits or ceases to resist arrest." *Acosta v. Mia.-Dade Cnty.*, 97 F.4th 1233, 1241 (11th Cir. 2024). Given Leach's resistance, a reasonable officer could conclude that tasing Leach once to gain compliance, even though Leach was already handcuffed but still resisting, was preferable to an extended struggle inside Weatherwalks's living room, which could have potentially harmed the Deputies or Leach himself. *See Smith*, 834 F.3d at 1294.

Finally, we recognize that Leach argues it was disputed (1) whether Deputies Clark, Allport, and Small illegally entered

Weatherwalks's residence to arrest Leach,[7] and (2) whether Clark wrote Leach a citation for felony DWLS prior to or after entering. These disputes, however, do not implicate (1) whether the Deputies had arguable probable cause to arrest Leach for felony DWLS, or (2) whether their force in effecting that arrest was excessive.

In sum, the district court did not err in concluding that, even under Leach's version of events, Leach had failed to show the Deputies' use of force was excessive and violated Leach's constitutional rights. Because Leach fails to satisfy this step of the qualified immunity analysis, we need not reach whether any purported constitutional violation was clearly established at the time of the Deputies' conduct.[8] *See Roberts*, 643 F.3d at 904.

---

[7] Absent consent or exigent circumstances, a warrantless entry into a home is unreasonable and violates the Fourth Amendment. *See McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007). It seems Weatherwalks, not Leach, owned the house. In any event, Leach brought a Fourth Amendment claim for excessive force against Deputies Clark, Small, and Allport, but he did not bring a Fourth Amendment claim stemming from their warrantless entry into Weatherwalks's house.

[8] The district court also concluded that Deputy Small was entitled to qualified immunity for (1) carrying the handcuffed Leach, who refused to stand, to the police car, and (2) leaving Leach in the backseat of a "hot" police car for 45 minutes. On appeal, Leach does not challenge these qualified immunity determinations.

C.    **Other Federal Claims against Deputies and Sergeant Tuggle**

In addition to the above excessive force claims, Leach also raised First Amendment retaliation and malicious prosecution claims against Sergeant Tuggle and Deputies Clark, Allport, and Small.  Leach addresses these claims for the first time in his reply brief, asserting in a conclusory fashion (1) as to his First Amendment retaliation claims, "the District Court [in]correctly determined there was no causal connection between Leach's speech and the use of force during the arrest"; (2) as to his malicious prosecution claims, the district court erred in concluding the criminal proceedings did not terminate in his favor and were not instituted with malice and without probable cause; and (3) Sergeant Tuggle, as a supervisor, had a duty to protect Leach's constitutional rights.

Leach also brought excessive force claims against Sergeant Tuggle and Deputies Poinsett and Collison.  For the first time in his reply brief, Leach makes a passing reference to these claims, stating, without citations to the record, that disputed facts "demonstrated the Individual Deputies were not entitled to qualified immunity."

"[W]e do not address arguments raised for the first time in a *pro se* litigant's reply brief."  *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008); *see also United States v. Campbell*, 26 F.4th 860, 871-73 (11th Cir. 2022) (en banc) (stating issues not timely raised in an initial brief are deemed forfeited).  Even if we did, Leach's

conclusory remarks fail to put forth argument, authority, or citations to the record showing Defendants violated his constitutional rights.  *See Roberts*, 643 F.3d at 904; *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).  At most, Leach presents bare assertions that the district court erred in concluding otherwise.  Notably too, even assuming Defendants violated Leach's constitutional rights, Leach wholly fails to argue or otherwise address whether those rights were clearly established at the time of Defendants' conduct in 2017.  *See Roberts*, 643 F.3d at 904.  "While we read briefs filed by *pro se* litigants liberally, issues not briefed on appeal by a *pro se* litigant are deemed abandoned."  *Timson*, 518 F.3d at 874 (citation omitted).

Accordingly, Leach has forfeited his challenge to the resolution of these other federal claims, and Leach thus has not shown the district court erred in granting summary judgment to the Deputies and Sergeant Tuggle.

## D.    Sheriff's Policies and Customs

Leach's initial brief does not present argument as to his claims against the Sheriff.  Rather, for the first time in his reply brief, Leach provides only conclusory assertions "without supporting arguments and authority" or citations to record evidence of the Sheriff's policies or customs.  *See Sapuppo*, 739 F.3d at 681.  Again, we do not address arguments raised for the first time in a *pro se* litigant's reply brief.  *Timson*, 518 F.3d at 874.  In any event, Leach has forfeited his claims against the Sheriff by presenting them in a perfunctory manner.

### E.    State Law Claims

Leach also forfeited any challenge to the district court's decision to not exercise its discretionary, supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(c)(3).  *See Silas v. Sheriff of Broward Cnty.*, 55 F.4th 863, 865 (11th Cir. 2022).  At most, Leach simply states, in the "Statement of Jurisdiction" section of his initial brief, that the district court "had supplemental jurisdiction" over these claims.  But Leach's passing reference to a potential jurisdictional basis for his state law claims is insufficient to raise the issue of whether the district court abused its discretion by failing to exercise that jurisdiction.  *See Sapuppo*, 739 F.3d at 681 (stating a party forfeits an issue by making passing references to it in the "statement of the case" section of his brief).

Accordingly, we affirm the district court's dismissal without prejudice of Leach's state law claims.

### V.    DENIAL OF MOTIONS FOR RECONSIDERATION

The district court also did not abuse its discretion in denying Leach's motions for reconsideration of the summary judgment order.  *See Samara*, 38 F.4th at 149.  Leach admitted these motions relied on evidence—the "transaction archive report"—that he possessed but "withheld" from the district court during summary judgment briefing.  Leach's motions as to the

purported cell phone video[9] basically attempted to relitigate matters decided in the district court's summary judgment order. A motion for reconsideration under Federal Rule of Civil Procedure 59(e) cannot be used for these purposes. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1313 (11th Cir. 2023) ("Rule 59(e) may not be used to relitigate old matters, or to raise argument or present evidence that could have been raised prior to the entry of judgment." (cleaned up)).

We therefore affirm the denial of Leach's motions for reconsideration of the district court's summary judgment order.

## VI.    LEACH'S REMAINING ARGUMENTS

We address three remaining issues raised by Leach.

First, Leach argues the district court erred by declining to consider "new evidence" submitted in a motion he filed on February 13, 2023, which the district court denied on June 9, 2023. We lack jurisdiction to review the district court's June 9, 2023 order because it was not encompassed by his February 1, 2023 notice of appeal. *See Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 661 (11th Cir. 1998) ("[A] notice of appeal [must] designate an existent judgment or order, not one that is merely expected or that is, or should be, within the appellant's contemplation when the notice of appeal is filed.").

---

[9] As recounted earlier, Leach claims he took a cell phone video that disputes the Deputies' version of the attempted traffic stop. Leach describes his cell phone video in his affidavit, but the video itself is not in the record.

Second, the district court did not abuse its discretion by denying Leach's motion to appoint counsel. Civil plaintiffs have no right to counsel. *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1065 (11th Cir. 2013). The appointment of counsel in a civil case "is warranted only in exceptional circumstances, and whether such circumstances exist is committed to the district court's discretion." *Id.* at 1063. Leach, "like any other litigant[], undoubtedly would have been helped by the assistance of a lawyer, but [his] case is not so unusual that the district court abused its discretion by refusing to appoint counsel." *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999).

Third, Leach asserts the trial court held his *pro se* pleadings to a higher standard. Leach does not address how the district court misconstrued his filings, and we discern no reversible error. As the district court correctly noted, *pro se* filings are entitled to liberal construction, but a court may not act as *de facto* counsel or otherwise rewrite a deficient pleading to sustain an action. *See Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168-69 (11th Cir. 2014).

## VII.   CONCLUSION

For the reasons above, we affirm the district court's (1) grant of summary judgment in favor of the defendants on Leach's § 1983 claims, (2) dismissal without prejudice of Leach's state law claims, and (3) denial of Leach's motions for reconsideration.

**AFFIRMED.**