[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14142
Non-Argument Calendar

_____

D.C. Docket No. 3:17-cv-00016-TCB

KIMBERLY ANNETTE ELLISON,

Plaintiff-Appellant,

versus

KENNETH WARREN HOBBS,
MICHAEL D. CONDIT,
Individually,
PATRICIA S. AYERS,
Individually,
BRANDON HOWARD,
Individually,
ERIC GASAWAY,
Individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 29, 2019)

Before WILLIAM PRYOR, GRANT and HULL, Circuit Judges.

PER CURIAM:

In this action brought under 42 U.S.C. § 1983, Plaintiff Kimberly Ellison appeals the district court's grant of summary judgment in favor of five defendants: (1) Eric Gasaway, a paramedic, and Brandon Howard, an emergency medical technician ("EMT"), both with the Coweta County Fire Department, and (2) Officer Kenneth Hobbs, Officer Michael Condit, and Sergeant Patricia Ayers of the Newnan Police Department.  Plaintiff Ellison's § 1983 action stems from the defendants' response to a 911 medical emergency call from Ellison's neighbor for Ellison, who was diagnosed with bipolar disorder and was experiencing a manic episode, and the defendants' transportation of Ellison to the hospital.  The entire series of events occurred on June 16, 2015 and were captured on the 911 call audio recording and videos from the body cameras worn by the three police officers.

The district court concluded that the defendants were entitled to qualified immunity on Ellison's claims that they unlawfully seized her and deprived her of liberty without due process of law in violation of the Fourth and Fourteenth Amendments.  After careful consideration and review of the record, including the audio and video recordings, we affirm the district court's grant of summary judgment in favor of all defendants.

2

## I.  FACTUAL BACKGROUND

### A.    The June 16, 2015 Incident

As background, in 2004, Ellison was diagnosed with bipolar disorder and was involuntarily hospitalized for an extended period for mental health treatment due to a manic episode.  Ellison described her symptoms before that involuntary hospitalization.  Ellison had not slept for several days and was having racing thoughts where "there is no sense" because the mental illness "takes over your brain."  Her symptoms slowly escalated in the days before her hospitalization.

On June 12, 2015, Ellison began to experience manic behavior, which was triggered by her prolonged visit at the Coweta County jail to see a client.[1]  After leaving the county jail, Ellison began to experience "the same panic" and "the same sleepless nights and the same racing thoughts" that triggered her involuntary hospitalization in 2004.

By the evening of June 15, 2015, Ellison was experiencing symptoms which caused her sister, Dawn Revere, concern regarding Ellison's mental state.  Ellison's symptoms included not sleeping for several days, "talking irrationally," and having racing thoughts making it "hard for her to stay on topic."  Revere was worried that "either [Ellison] hadn't taken [her medication] or that it wasn't working properly."

---

[1]Ellison is an attorney who has been licensed to practice law in Georgia since 2004.

Over the course of the evening, and into the early morning hours of June 16, 2015, Ellison visited her neighbors multiple times. Specifically around 8:00 p.m. on June 15, Ellison went to Adrienne Wiggins's apartment, communicated in an irrational and incoherent manner, and advised Wiggins that she was having "racing thoughts." At this point, Ellison was experiencing elevated blood pressure and pulse, chest pains, shortness of breath, and a loss of balance which caused her to "lose [her] footing and [her] balance and end up on the floor." After Wiggins escorted Ellison back to her apartment, Ellison continued to return to Wiggins's apartment several more times. Ellison also sent Wiggins a text message acknowledging that she needed to go to the hospital for treatment.

Wiggins already knew about Ellison's mental health history and bipolar disorder diagnosis. Wiggins believed that Ellison was experiencing a manic breakdown and that there were issues perhaps with Ellison's medications or her compliance with taking them. Wiggins contacted Revere, Ellison's sister, about her concern for Ellison's condition, and they discussed plans to take Ellison to a doctor for evaluation and/or treatment on the following morning.

Around 1:00 a.m. on June 16, Ellison woke up another neighbor, Rex Payne, by sending him approximately 40 text messages, and then knocking on his apartment door, asking that he accompany her to her apartment. Ellison told Payne that "she may get to the point that she might need some help," that he may need "to

4

take her to the doctor later if she got too manic," and "asked [Payne] to take her car keys." Payne and Ellison talked for awhile, and Payne left when Ellison seemed to calm down.

Around 2:00 a.m., Ellison went to Wiggins's apartment again and began aggressively and loudly banging on her door and screaming and yelling in the hallway. Wiggins believed that Ellison was no longer coherent and lucid.

Around 3:30 a.m., Ellison knocked on the door of a third neighbor, Roy Brown, and told him that something was wrong. Brown explained that, "[a]t first, Ellison seemed panicked, and [Brown] thought that she had been attacked or someone had hurt her."

Ellison's irrational and manic speech and behavior in the early morning hours of June 16 was not normal behavior for her, and her neighbors were concerned. Ellison admitted that "[n]obody had ever seen me like this before." Ellison tried to control her bipolar symptoms with meditation and other calming techniques. Brown and Payne stayed with Ellison in her apartment and talked about taking Ellison to the hospital.

Meanwhile, due to Ellison's behavior, Wiggins attempted to contact Ellison's sister, Revere, on at least eight different occasions to figure out how to safely transport Ellison to a hospital for immediate mental health treatment. Wiggins, however, was unable to reach Revere. Although Wiggins called the

5

apartment complex's courtesy officer for assistance in transporting Ellison to a hospital, the courtesy officer suggested that she call 911.

## B.    Neighbor's 911 Call at 4:30 A.M.

Around 4:30 a.m., Wiggins called 911 requesting emergency medical services for Ellison.  In the 911 call recording, Wiggins stated that she was concerned about Ellison's mental condition, as Ellison was bipolar and having a "manic breakdown."  Wiggins requested an ambulance.  Wiggins told the 911 dispatcher that she and Ellison's sister had intended to take Ellison to the doctor later that morning when the doctor's office was open, but she did not think they could wait any longer.  Wiggins stated that Ellison was "not going to make it until the morning, she's incoherent, she's having racing thoughts, nothing she's saying is making sense."

Wiggins told the 911 dispatcher that she thought Ellison was "becoming combative" and that Ellison needed to go to the hospital and "to be medicated before this escalates into something."  Wiggins explained that she "was not sure if [Ellison's] medicines are off, but she has been having a couple of rough days." "She's been trying to control her behavior herself, but she's now at a point where she's not really lucid, she's [engaging in] repetitive behavior, [and] she's having racing thoughts."  Wiggins stated that Ellison "insists on her pulse being taken . . . I've been taking her pulse . . . I don't think she's ill, but she's becoming more and

6

more irrational." Wiggins advised that Ellison "is trying to do yoga and meditate this away."

The 911 dispatcher asked if Ellison had harmed herself, and Wiggins responded, "No, but she's beginning to say that she may hit other people and someone may have to hit her . . . so she's starting to say things like that, and that's why I'm calling . . . because she may hit people, she may throw things . . . she may become combative, and that's why I'm calling before this escalates and she just is combative." Wiggins confirmed that Ellison had not harmed herself or anyone else at that point though. Wiggins reported that Ellison did not have access to any weapons in the house, and that Ellison was not under the influence of any illegal drugs or alcohol.

The 911 dispatcher sent an ambulance and the police to respond to the call.

## C.    Response to 911 Call

Around 4:37 a.m., Officer Hobbs was the first to arrive and met Wiggins outside of the apartment building's entrance. Wiggins told Officer Hobbs much of the same information about Ellison that she told the 911 dispatcher. Wiggins explained to Officer Hobbs that Ellison was bipolar, "slowly spiraling," and Wiggins did not "know if [Ellison's] medicines were off." Wiggins stated that she "believed that [Ellison] took her medicine [on June 15]." Wiggins said she had a plan to take Ellison to the doctor in the morning but did not think Ellison could

7

wait until then because "she [was] not rational" and she was starting to "say things like I might hit people, I might hurt somebody." Officer Hobbs asked Wiggins how Ellison would feel about the police being present, and Wiggins responded that Ellison "may or may not be combative." Wiggins explained that Ellison needed to go to the hospital.

Officer Condit arrived around 4:38 a.m. and was briefed on the situation. Officer Hobbs followed Wiggins inside the apartment building, while Officer Condit waited outside for the emergency medical personnel. While on the way to Ellison's apartment, Officer Hobbs and Wiggins met neighbor Brown, who stated that he believed that Ellison needed to go to the hospital. Brown accompanied Officer Hobbs and Wiggins to Ellison's apartment.

Around 4:39 a.m., Paramedic Gasaway and EMT Howard arrived, and Officer Condit gave them an overview of the situation. Officer Condit explained that Ellison suffers from some type of anxiety and is on medication, but it is not working, and that her neighbor called 911 because Ellison could not control her symptoms. Paramedic Gasaway, EMT Howard, and Officer Condit then walked down the hallway to Ellison's apartment.

**D.    Interaction with Ellison**

When Officer Hobbs and neighbors Wiggins and Brown arrived at Ellison's apartment, the door was partially open. Brown opened the apartment door further,

8

and Ellison was standing inside the apartment's entryway with her neighbor Payne. Officer Hobbs entered Ellison's apartment first, while Officer Condit, Paramedic Gasaway, and EMT Howard stood outside the front door in the hallway.

Ellison greeted Officer Hobbs warmly, said she wanted to hug him, and gave him a hug. Ellison invited Officer Hobbs into her apartment and stated that she would tell him her medical history and get her medical records.

At the time, Ellison was in a manic state of mind, exhibiting racing, rambling, and disjointed thought patterns, excessive and rapid non-stop talkativeness, and hyperactivity, which indicated that she was suffering a manic episode.

Ellison instructed everyone to listen and said, "I'm in charge because I'm not crazy yet but I know where I'm headed because I broke down in 2004." Ellison stated that she had a "museum" in her apartment and her entire family was coming to her apartment. Ellison agreed with Officer Hobbs that she needed to get her medicines and her past medical records.

Ellison also advised Officer Hobbs that "I'm letting you in my house and I know you need to protect me," and that everyone should take notes because "in probably two or three hours, I'm going to be mute." Officer Hobbs then said they should handle Ellison's medicines first, and Ellison said "No . . . no, I'm in control." Officer Hobbs attempted to explain that it was Ellison's idea, and Ellison

9

said that she was in control and told him to shut up.  Ellison then advised Officer

Hobbs that "I'm going to get combative.  That's why you're here."

Ellison walked out of her apartment door and spoke with neighbors Wiggins

and Brown in the hallway about her advance directive[2] and appeared to be short of

breath.  Officer Hobbs was inside the apartment and Paramedic Gasaway, EMT

Howard, and Officer Condit were standing in the hallway with Ellison, Brown, and

Wiggins.  Officer Hobbs then asked Ellison, "how do you feel about going to the

hospital," and she responded, "I want to go to the hospital."

While Ellison continued to ramble, Paramedic Gasaway started to speak to

her.  Ellison became agitated and screamed, "Stop!" three times at Paramedic

Gasaway.  Ellison continued to ramble, stating that "[Payne] is in charge,

[Wiggins] is going to walk my dog, no, I'm sorry, everybody please be quiet, I

don't have a television in here, and you need to stop laughing or whatever is going

on, and I'm in charge."

At this point, Officer Hobbs was standing in the apartment's doorway and

started to speak to Ellison again.  In response, Ellison became irritated, pointed at

Officer Hobbs, and screamed at him to "Stop!"  Officer Hobbs tried to get Ellison

to listen, saying, "you said you wanted to go to the hospital."

---

[2]See O.C.G.A. § 31-32-4 (2018) (written document appointing someone to make health care decisions for an individual when that individual cannot make his or her own health care decisions).

Ellison yelled "Stop!" again and quickly pushed past Officer Hobbs to get back into her apartment and moved towards neighbor Payne, who was further inside the apartment. As Ellison moved past Officer Hobbs, he grabbed her arms and restrained her from behind by her arms. While Ellison attempted to resist Officer Hobbs's grip, she yelled "advance directive, Monday night, 911, ICE, get my bags!" and told her neighbors to pack her bags to go to the hospital. While Ellison was resisting, Officer Hobbs and Ellison moved into the building's hallway. Officer Hobbs told Ellison to calm down. Due to Officer Hobbs's grip on Ellison's arms and the sleeves of her bathrobe, one of Ellison's breasts was briefly exposed, but EMT Howard covered her back up a few seconds later. Ellison then instructed Officer Hobbs to let her go, which he did, and she calmed down.

Ellison walked back into her apartment with Officer Hobbs, Paramedic Gasaway, EMT Howard, and her neighbors following her. After about 30 seconds, Officer Hobbs walked out of Ellison's apartment into the hallway, and Paramedic Gasaway and EMT Howard followed shortly thereafter. While in the hallway, Officer Hobbs asked Paramedic Gasaway what he wanted to do. In response, Paramedic Gasaway explained "we [have] got to take her, that's all there is to it."

Ellison walked to her apartment door and told the officers and emergency medical personnel to "wait a minute, wait a minute, monitor okay, wait just a

11

second." She then slammed and locked the door with Officer Hobbs, Officer Condit, Paramedic Gasaway, and EMT Howard outside in the hallway. None of the defendants attempted to force their way into Ellison's apartment while her door was closed.

About one minute later, neighbor Wiggins exited Ellison's apartment, leaving the apartment door slightly ajar. Neighbor Payne then exited the apartment into the hallway and explained that Ellison was trying to get dressed. Officer Hobbs asked Payne whether he thought Ellison would go willingly, and Payne stated that he did not know because she was getting mad at him when he tried to convince her to go willingly to the hospital. Payne went back into Ellison's apartment and left the door cracked open.

Outside in the building's hallway, neighbor Wiggins discussed with the group her original plan to drive Ellison to the doctor's office in the morning. The group agreed that it was too risky for Wiggins to drive Ellison in her car given Ellison's unpredictable behavior. Paramedic Gasaway asked Wiggins additional questions about Ellison's medication, and Wiggins explained that Ellison does take her medication and it works.

After several minutes passed, Officer Hobbs pushed open the slightly ajar door with his hand while he stood in the hallway. Officer Hobbs spoke to Ellison saying "I'm doing what you told me to do" by standing out in the hallway. Ellison

then waved Officer Hobbs into the apartment, stating "you can come in, leave the others out." She told Officer Hobbs that it would be nice "if you would stay in here and we learn to trust each other." Subsequently, Ellison also allowed Paramedic Gasaway inside her apartment after Officer Hobbs explained that Paramedic Gasaway was there to help take her pulse. Ellison explained that "I haven't slept since [June] 11, and I'm manic, and I know I am." She showed Paramedic Gasaway her medications while she asked neighbor Brown if he was packing her bag for the hospital.

Around 4:58 a.m., Sergeant Ayers arrived, and Officer Condit met her outside of the building and briefed her on the situation. He told Sergeant Ayers that Ellison was "bipolar and slowly escalating to a combative state, [the emergency medical personnel] ha[ve] already said they are going to take her, she has to go," and that the emergency medical personnel had prepared soft restraints to take her to the hospital.

At the apartment, Ellison greeted Sergeant Ayers warmly and asked about her history in law enforcement. EMT Howard entered the apartment with Sergeant Ayers, and Officer Condit stood at the apartment's doorway. Ellison said "Hi! How's everyone doing, welcome, tell me what your strengths are and introduce yourself in just a minute." Paramedic Gasaway asked Ellison, "are you going to go to the hospital with us," and Ellison responded, "no, I'm making my list." The list

consisted of various passwords, telephone numbers, and other directions to her neighbors to prepare for hospitalization.

Ellison continued to walk around her apartment talking in a disconnected manner about different topics. Sergeant Ayers asked Paramedic Gasaway what was going on. He replied, "We're gonna have to forcibly take her. That's all there is to it." EMT Howard prepared the soft restraints.

Ellison then sat down on the couch. Ellison said she needed everyone to be quiet, but she kept talking. She switched topics again, calling herself "the Queen," and stating that no one could talk for ten minutes. She hopped up from the couch as Paramedic Gasaway attempted to pack her medications. Ellison continued talking, said "Damn!" and stated that she does not cuss unless she is manic. She began discussing her boyfriend, and Sergeant Ayers attempted to speak with her. In response, Ellison jumped and screamed at Sergeant Ayers "Stop! Stop! Stop!" She began giving instructions for the care of her dog.

Ellison sat back down on the couch. After Paramedic Gasaway and EMT Howard prepared the soft restraints, Sergeant Ayers said to them, "Do what you got to do." Paramedic Gasaway and EMT Howard approached Ellison and said, "It's time for us to go to the hospital" and reached for her arms. As Paramedic Gasaway and EMT Howard reached for her, Ellison yelled "Stop!" and began flailing her arms and legs. When Paramedic Gasaway and EMT Howard placed

14

Ellison's hands in soft restraints, Ellison screamed with her legs open, and then Officer Hobbs kneeled down in front of Ellison to keep her legs together and prevent her from exposing herself.  Ellison yelled for someone to call her dad and then told Paramedic Gasaway and EMT Howard, "I'm calm, I'm calm" and asked them to "take my pulse, take my pulse."

Ellison became agitated again and screamed several times for Payne.  She stated, "I'm gonna punch somebody in a minute."  The officers responded, "No, you're not."  Ellison said that she was talking out her present feelings so that they knew how she was feeling.

Ellison stated that she understood that she might be under arrest, but the officers reassured her that she was not under arrest, that they were there to help, and that she was going to the hospital.  Paramedic Gasaway and EMT Howard told Ellison that they were just taking her to the ambulance.  She replied, "Okay. Okay."  Ellison began to calm down, stating that she wanted to be quiet, but then she suddenly resumed yelling and screaming and reclined back on the couch. Sergeant Ayers said "Let's get her out of here ASAP."

Paramedic Gasaway and EMT Howard walked Ellison out of her apartment. Ellison walked out under her own power with Paramedic Gasaway and EMT Howard on each side of her holding on to the soft restraints.  At the apartment's doorway, Ellison yelled about putting on shoes, and Paramedic Gasaway helped

15

her put shoes on.  She also said that she needed to get dressed.  Paramedic Gasaway told her that she had been given an opportunity to get dressed, so Ellison instructed one of her neighbors to pack her bag.

When Ellison was in the building's hallway, she began yelling and screaming again.  Ellison discussed the possibility that she missed her medicine, stating that she needed to take her medicine at 8:00, and Paramedic Gasaway said he was bringing her medicine.  Paramedic Gasaway and EMT Howard walked Ellison outside and helped her climb into the ambulance.  Once she got to the stretcher, she unbuckled the straps on her own and laid down, stating "I know how to get in here, so I'm going to help you, and I'm going to lay down here."

When she laid down in the stretcher, Ellison stated that she needed to take her medicine at 8:00, but Officer Condit informed her that it was only 4:30 in the morning.  Ellison asked for her medicine, stating "I need to take it because it'll knock me out, and it'll knock me on my ass, and I need to do that."  Officer Condit told her that all would be taken care of when she arrived at the hospital.  Paramedic Gasaway and EMT Howard buckled Ellison into the stretcher.

Around 5:18 a.m., Paramedic Gasaway and EMT Howard transported Ellison to Piedmont Newnan Hospital.  They assessed Ellison's vitals prior to transport.  Ellison's blood pressure was dangerously high, reading 205/119, and her pulse was 120 bpm.

16

Paramedic Gasaway, who was responsible for care at the scene, explained his decision to restrain and transport Ellison to the hospital.  Gasaway stated that, as an experienced paramedic, he knew "that a sudden onset of erratic behavior or altered mental status can have a variety of underlying medical causes" and, after observing Ellison, he concluded that she "needed to be seen by a doctor." Gasaway further determined "based upon [his] observations of [Ellison's] behavior, her physical condition, her altered state of consciousness, the information provided by the neighbors and [his] professional judgment and experience, . . . that she was not able to make informed decisions regarding her health," "understand the nature and severity of her potential disease process," or "understand the risks of refusing care," and she "did not demonstrate adequate medical decision-making capacity, thereby providing implied consent."  Gasaway also believed that "Ellison was a potential danger to herself and others" because of "her erratic, uncontrolled violent verbal outbursts and unpredictable behavior" and, therefore, "applied soft restraints to her wrists for her safety, our safety and the safety of others present."

## E.    Piedmont Newnan Hospital

Once at Piedmont Newnan Hospital, at around 5:26 a.m., Paramedic Gasaway and EMT Howard transferred Ellison's care to the hospital staff.  At the hospital, Ellison continued her manic behavior, including yelling and screaming,

17

banging on windows and doors, and attempting to leave.  She told the hospital staff that her "dad will bring [a] gun and take care of things."

Dr. Gottfrid Karlsson saw Ellison in the emergency room.  Around 6:42 a.m., Dr. Karlsson determined that Ellison needed to be admitted involuntarily and executed a Form 1013 order for psychiatric evaluation.  Dr. Karlsson authorized Ellison's transport to Summit Ridge Hospital, an emergency receiving facility, confirming that he had "personally examined Kimberly Ellison on 6/16, 2015 at 6:42 a.m."  At the time of his evaluation, Dr. Karlsson concluded that: (1) "[t]his [i]ndividual appears to be mentally ill"; (2) his evaluation was based on his personal observations of her "[e]xpanded mood, pressured speech, disorganized speech"; and (3) she "[p]resents an imminently life endangering crisis to self because []she is unable to care for []her own health and safety."

## F.    Summit Ridge Hospital

On June 16, Ellison was transferred by ambulance from Piedmont Newnan Hospital to Summit Ridge Hospital.  That same day, Ellison executed a "Notice of Involuntary Admission and Right to Hearing," acknowledging her right to petition for a writ of habeas corpus if she believed she was being held illegally.

On June 17, Ellison underwent a psychiatric evaluation at Summit Ridge Hospital.  Based on that evaluation, Ellison's physician made the medical determination to admit Ellison for further treatment for purposes of "safety and

stabilization" for five to seven days.  On June 17, Ellison executed a Form 1012 requesting that she be transferred "from involuntary status to voluntary status," which her physician approved.  Ellison remained at Summit Ridge Hospital until her discharge on June 23, 2015.

## II.  PROCEDURAL HISTORY

In February 2017, Ellison brought this § 1983 action against these five defendants in their individual capacities: Paramedic Gasaway, EMT Howard, Officer Hobbs, Officer Condit, and Sergeant Ayers.  In relevant part, Ellison alleged the defendants violated (1) her Fourth Amendment right to be free from unreasonable seizure when they involuntarily restrained her and transported her to the hospital without probable cause and (2) her Fourteenth Amendment right to be free from liberty deprivations without due process of law because they failed to follow state procedures for the involuntary seizure of mentally ill persons.

The defendants later moved for summary judgment on these federal claims. Ellison cross-moved for partial summary judgment against the defendants on her Fourth Amendment unreasonable seizure claim.

The district court granted summary judgment in favor of the defendants on all federal claims based on qualified immunity.  Ellison timely appealed.[3]

---

[3]In addition to the federal claims set forth above, Ellison also brought a federal claim against Sergeant Ayers alone for violating her Fourth and Fourteenth Amendment rights by failing to properly supervise Officers Hobbs and Condit and a separate claim against all

## III.  STANDARD OF REVIEW

We review <u>de novo</u> a district court's grant of summary judgment based on the defense of qualified immunity.  <u>May v. City of Nahunta</u>, 846 F.3d 1320, 1327 (11th Cir. 2017).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making a determination about summary judgment, "a court must view the evidence in the light most favorable to the opposing party."  <u>Tolan v. Cotton</u>, 572 U.S. 650, 657, 134 S. Ct. 1861, 1866 (2014) (quotation marks omitted).

For the most part, the parties do not dispute the facts.  Further, Ellison's interaction with the defendants was recorded on body cameras worn by the three police officers, and Ellison agrees with the use of the 911 call audio and body camera video recordings as authentic proof of the facts.

---

defendants for attorneys' fees.  As to these claims, the district court also granted summary judgment in favor of the defendants.  In her brief on appeal, Ellison does not provide any argument regarding these federal claims.  Therefore, they are considered abandoned and are not addressed.  <u>See</u> <u>Access Now, Inc. v. Sw. Airlines Co.</u>, 385 F.3d 1324, 1330 (11th Cir. 2004) (explaining that legal claims or arguments that have not been briefed before this Court will not be addressed).

Ellison also alleged state law claims against the defendants, and the district court declined to exercise supplemental jurisdiction over them.  Ellison's brief does not address them, and neither do we.

## IV.  QUALIFIED IMMUNITY

The qualified immunity defense shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Qualified immunity balances two important public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).

A defendant claiming qualified immunity "must first prove that he acted within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  If he does so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate" because the defendant's conduct violated a clearly established constitutional right.  Id.

## V.  DISCRETIONARY AUTHORITY

To determine whether the challenged actions were within the scope of the defendant's discretionary authority, courts ask "'whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related

21

goal), (b) through means that were within his power to utilize.'" Estate of Cummings v. Davenport, 906 F.3d 934, 940 (11th Cir. 2018) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id. (quotation marks omitted). For instance, "in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches in general is a part of his job-related powers and responsibilities." Holloman, 370 F.3d at 1266.

"After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function—that is, pursuing his job-related goals—in an authorized manner." Id. "Each government employee is given only a certain 'arsenal' of powers with which to accomplish [his] goals." Id. at 1267.

22

## A.    Paramedic and EMT

Ellison argues that Paramedic Gasaway and EMT Howard were not acting within the scope of their authority when they involuntarily placed her in soft restraints and transported her to Piedmont Newnan Hospital.

We disagree because Gasaway, as a certified paramedic, and Howard, as a certified EMT, were authorized by state law to "render first aid and resuscitation services," which includes the authority to decide whether a person's medical condition warrants transport to a hospital. See O.C.G.A. §§ 31-11-53(a)(1), 31-11-54(a), and 31-11-55(1)(a) (authorizing medical services that may be rendered by certified paramedics and EMTs); cf. Griesel v. Hamlin, 963 F.2d 338, 342 (11th Cir. 1992) (determining, for purposes of state sovereign immunity, that an EMT responding to an official call had the authority to decide whether the plaintiff's medical condition made it necessary or appropriate to transport him to the hospital in the ambulance).

Moreover, it was part of their jobs to determine if Ellison had adequate medical decision making capacity to refuse transport to a hospital for emergency medical care. Specifically, pursuant to state law and regulations, the Coweta County Fire Department has adopted Standing Orders and Protocols ("SOPs") for its emergency medical personnel. See O.C.G.A. § 31-11-5(a); Ga. Comp. R. &

23

Regs. § 511-9-2-.07(6)(h)(4).[4]  The SOPs instruct that "all patients seeking 911

services be transported to the hospital for evaluation when medically necessary,"

but also provide that a patient may refuse transport of self "if they demonstrate

adequate medical decision making capacity."  Adequate medical decision making

capacity includes: (1) being able to make informed decisions regarding health and

(2) appearing lucid and not having impaired judgment because of a medical

condition.  The SOPs contemplate justified uses of physical restraints—soft

restraints like those used here—in certain situations, such as when the patient is

unable to follow instructions and is at a high risk of injury or is a danger to self or

others.  The SOPs emphasize that while they are guidelines for action, the clinical

"judgment of the providers[] on-scene remain sovereign," which is consistent with

the Georgia regulations.  See Ga. Comp. R. & Regs. § 511-9-2-.07(6)(i) ("Control

of patient care at the scene of an emergency shall be the responsibility of the

individual in attendance most appropriately trained and knowledgeable in

providing prehospital emergency care and transportation.").

---

[4]In O.C.G.A. § 31-11-5(a), the Georgia Department of Public Health has authority to adopt rules and regulations for the protection of public health and standards for transporting patients in ambulances by emergency medical providers. See O.C.G.A. § 31-11-5(a).  In turn, the Department has promulgated regulations, which provide that a "local medical director" shall approve the local policies and procedures for emergency medical care, provided such policies are not in conflict with the rules and regulations of the Department or other state statutes. See Ga. Comp. R. & Regs. §§ 511-9-2-.07(6)(h)(4), (h)(5).  Here, the Coweta County Fire Department has adopted such policies, approved by the medical director.  On appeal, Ellison does not challenge the validity of the Fire Department's SOPs.

Ellison urges that her condition on June 16 was not a medical emergency and that she remained "sufficiently lucid" to make a cogent transport decision such that Paramedic Gasaway and EMT Howard were not authorized to involuntarily transport her. Even assuming Ellison were correct about her mental state, Paramedic Gasaway was nonetheless performing a legitimate, job-related function when he exercised his discretion and clinical judgment, based on his experience and knowledge as a trained paramedic, and determined that Ellison did not possess adequate medical decision making capacity to make an informed decision to refuse transport to the hospital. The decisions Paramedic Gasaway had to make here, right or wrong, were part of his job-related powers and responsibilities. See Holloman, 370 F.3d at 1266.

Even though they were performing a legitimate, job-related function, Ellison also argues that Paramedic Gasaway and EMT Howard were not performing that function through authorized means, which is the second prong of the discretionary function test. Ellison alleges they failed to comply with the Georgia law governing the involuntary seizure of mentally ill persons and their transportation to a "mental health emergency receiving facility" for a "mental evaluation."

Although Ellison cites O.C.G.A. §§ 37-3-41 and 37-3-42, these statutes involve involuntary civil custody and involuntary treatment of a mentally ill patient

25

at a "mental health emergency receiving facility."[5]  The threshold problem for

Ellison is that Paramedic Gasaway and EMT Howard did not transport Ellison to a

"mental health emergency receiving facility" for involuntary mental health

treatment.  Rather, they responded to a 911 medical emergency call and

transported Ellison to a hospital for emergency medical care.  Notably too, it was a

physician at Piedmont Newnan Hospital who later placed Ellison in involuntary

civil custody for purposes of involuntary mental health evaluation and treatment

and had her transported to a "mental health emergency receiving facility," Summit

Hospital.  But Paramedic Gasaway and EMT Howard had nothing to do with this

decision.  And it was well within their job duties to transport Ellison to the hospital

based on Paramedic Gasaway's determination that she lacked adequate medical

decision making capacity.

Also, contrary to Ellison's contentions, the use of soft restraints is a tool

available to Paramedic Gasaway and EMT Howard in performing their job-related

functions.  See Davenport, 906 F.3d at 940.  Thus, because Paramedic Gasaway's

---

[5]Under Georgia law, an individual may be placed into involuntary civil custody for purposes of mental health evaluation and treatment in three circumstances: (1) where a physician executes a certificate stating that he personally examined the person within the preceding 48 hours and found that, based upon observations set forth in the certificate, that person appears to be a mentally ill person requiring involuntary treatment; (2) by a court order commanding any peace officer to take such person into custody and deliver her for examination to the nearest mental health emergency receiving facility or to a physician who has agreed to examine the patient; and (3) where a peace officer observes (a) the person committing a penal offense, and (b) the peace officer has probable cause for believing that the person is a mentally ill person requiring involuntary treatment.  See O.C.G.A. §§ 37-3-41, 37-3-42.

26

and EMT Howard's actions were not outside their "arsenal" of powers, they acted within their discretionary authority.  See Holloman, 370 F.3d at 1267.

## B.    Police Officers

We also reject Ellison's argument that the three police officers' actions were outside the scope of their discretionary authority.  Ellison contends that the officers "aided and abetted" her seizure by the emergency medical personnel and thereby violated the Georgia law and the Newnan Police Department's procedures regarding the involuntary seizure of mentally impaired persons.  Ellison alleges the police officers had no authority to take her into custody and transport her to the hospital, as they did not observe her commit a crime.

Ellison's claims against the officers also fail.  First, each of the police officers responded to Wiggins's 911 call in their role as peace officers to assist emergency medical personnel and maintain safety at the scene.  This is a classic police activity and well within the officers' job responsibilities and discretionary authority.  See O.C.G.A. § 45-9-81(7) (defining a "law enforcement officer" as having duties including the "protection of life" and the "preservation of public order"); Brigham City v. Stuart, 547 U.S. 398, 406, 126 S. Ct. 1943, 1949 (2006) (explaining the role of peace officers as including "preventing violence and restoring order, not simply rendering first aid to casualties").

27

Second, the officers did not use any means while performing their job-related functions that were not within their "arsenal" of powers. See Holloman, 370 F.3d at 1267. Ellison was never under arrest or in police custody. It was Paramedic Gasaway, not the officers, who decided that Ellison was too impaired to make medical decisions and that it was medically necessary to transport Ellison to Piedmont Newnan Hospital and to do so in soft restraints. The officers did not place Ellison in the soft restraints, place her in the ambulance, or transport her to the hospital.

## VI. CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT

Once we determine that a defendant was acting within his discretionary authority at the time of the challenged conduct, the plaintiff must make two showings to overcome a qualified immunity defense. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199-1200 (11th Cir. 2007). First, she "must establish that the defendant violated a constitutional right." Id. at 1199. Second, she must show the violated right "was clearly established." Id. "Both elements of this test must be satisfied for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed appropriate for the case." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

Regarding the clearly established prong, "[a] [g]overnment official's conduct violates clearly established law when, at the time of the challenged

28

conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would understand that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).  In determining whether a right is clearly established, this Court looks to "judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state."  Griffin Indus., 496 F.3d at 1199 n.6.

The clearly established law must be "particularized" to the facts of the case. Anderson, 483 U.S. at 640, 107 S. Ct. at 3039 (citation omitted).  The "'salient question' . . . is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional."  Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting in part Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002)).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of the pre-existing law the unlawfulness must be apparent."  Anderson, 483 U.S. at 640, 107 S. Ct. at 3039.[6]

_____

[6]Plaintiffs can demonstrate that the contours of the right were clearly established in three ways.  See Terrell v. Smith, 688 F.3d 1244, 1255-56 (11th Cir. 2012).  "First, the plaintiffs may show that a materially similar case has already been decided.  Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary."  Id.  (citations, quotation marks, and alterations omitted).  Ellison relies on

29

## A.    Fourth Amendment

Ellison argues that defendants Paramedic Gasaway and EMT Howard violated her clearly established Fourth Amendment rights by restraining and involuntarily transporting her to the hospital without having probable cause to believe that she posed a threat of harm to herself or others.  She alleges that the three defendant police officers aided and abetted that illegal restraint and transport.

The Fourth Amendment guarantees the right of persons to be free from unreasonable seizures.  U.S. Const. amend. IV.  This Court has held that "[f]or Fourth Amendment purposes, a seizure occurs when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'"  Roberts v. Spielman, 643 F.3d 899, 905 (11th Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)).

Here, Ellison arguably gave mixed signals as to whether she wanted to go to the hospital or not.  Further, whether she went to a general hospital or a "mental health emergency receiving facility," Ellison contends she suffered a mental-health seizure.  For purposes of summary judgment, we will assume Ellison did not go to the hospital voluntarily and was seized by defendants Paramedic Gasaway and EMT Howard.  The constitutional question thus becomes under what

---

only the first method to show that the defendants had fair warning and does not advance the others on appeal, and, therefore, we do not address the second or third methods.

30

circumstances can emergency medical personnel take a mentally ill person involuntarily to a hospital.

This Court has held that "[i]n the context of a mental-health seizure, '[w]hen an officer stops an individual to ascertain that person's mental state . . . the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others.'" May, 846 F.3d at 1327-28 (quoting in part Roberts, 643 F.3d at 905). "'[T]o be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause, but only arguable probable cause'—that is, 'the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.'" Id. at 1328 (quoting Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)).

The district court recited certain facts and found that the defendants had at least arguable probable cause for Ellison's seizure. The district court explained that the defendants responded to a 911 call where a neighbor reported about Ellison's recent statements indicating a possibility that she would harm herself or others and observed Ellison's behavior when they arrived. While Ellison admits that she was in a manic episode, she contends that there is a genuine issue of material fact as to whether she would harm herself or others and thus the district court erred in granting summary judgment on her claims.

Ellison mainly relies on Roberts v. Spielman, 643 F.3d 899 (11th Cir. 2011), but that decision does not help Ellison.  In fact, Roberts held that the defendant in that case did not violate the plaintiff's Fourth Amendment rights.  See id. at 905-06.  If anything, the particular facts in Ellison's case establish an even stronger probable cause basis for a valid mental-health seizure than Roberts.  A deputy sheriff in Roberts responded to a 911 call about a possible suicide attempt by the plaintiff.  Id. at 902-03.  Upon arriving at the plaintiff's home, the deputy was told by the plaintiff's former sister-in-law that she had been trying to contact the plaintiff for over an hour, the plaintiff had a history of suicide attempts, and the plaintiff was taking medication for bipolar disorder.  Id. at 902.  After ignoring the deputy knocking on her door, the plaintiff was verbally abusive when he opened her door, telling him to "get the f--- out of my house."  Id.  The deputy grabbed the plaintiff and briefly removed her from her house to explain to her that he was there to perform a "welfare check."  Id. at 903.  The deputy left the plaintiff's property shortly thereafter, after ensuring that the plaintiff had not attempted suicide and was not suicidal.  Id. at 903-04.  In Roberts, the plaintiff argued that the deputy should have left her property and not seized her at all when he saw that she was alive.  Id. at 905.

This Court determined that, under the particular factual circumstances the deputy confronted in Roberts, the deputy's conduct did not violate the Fourth

32

Amendment because it was objectively reasonable for the deputy to believe that the plaintiff may have been in need of immediate aid even though she was alive. Id. In particular, the Court concluded that, in light of what the deputy had been told and had observed, he "could reasonably have believed that [the plaintiff] posed a danger to herself that justified his remaining inside the doorway of her home for about five minutes and then, for safety reasons, briefly removing her from the home while he tried to calm her down and determine her mental state." Id. at 906. Alternatively, the Court concluded that, even assuming a Fourth Amendment violation, a reasonable officer in the deputy's shoes would not have known that his conduct was unlawful. Id.

Here, even considering Ellison's mixed signals, the defendants nonetheless had considerable and reasonable cause for concern. They not only received a 911 call from a neighbor but actually observed Ellison's clear and serious medical problems. Wiggins's 911 call reported that Ellison was having a "manic breakdown" and needed to go to the hospital. Wiggins credibly reported to the 911 dispatcher, and also to the defendants when they arrived, that she was concerned that Ellison was going to become combative and that Ellison had expressed that she may hurt someone. Upon the defendants' arrival, Ellison was in a manic state of mind, exhibiting racing, rambling, and disjointed thought patterns, excessive and rapid non-stop talkativeness, and hyperactivity. In the defendants' presence,

33

Ellison expressed her own concern that she was going to get combative and "punch somebody in a minute." Based on the information provided by Wiggins and his own on-scene observations of Ellison, professional experience, and clinical judgment, Paramedic Gasaway determined that Ellison needed to be taken to the hospital, she did not have adequate medical decision making capacity to refuse to go to the hospital, and she needed to be restrained for her and others' safety while they escorted her into the ambulance.

Ultimately, we need not resolve the probable cause issue because, in any event, Ellison has not identified any prior case, and we have found none, that provided fair warning to the defendants that, under the particularized facts they faced, their conduct violated Ellison's Fourth Amendment rights. Ellison cites no case where a court concluded that emergency medical personnel responding to a 911 emergency call for medical assistance violated the rights of a patient, who was incapable of making an informed decision about her health, by restraining that patient and transporting her to a general hospital for evaluation by a physician.[7] Therefore, there is no clearly established law that would have put a reasonable officer, paramedic, or EMT on notice that the actions the defendants took to

---

[7]To the extent Ellison also relies on Boatright v. State, 761 S.E.2d 176 (Ga. Ct. App. 2014), to show that the right was clearly established, that decision is from the Court of Appeals of Georgia, which is not the highest court of Georgia. See Griffin Indus., 496 F.3d at 1199 n.6.

34

restrain and transport Ellison to the hospital violated Ellison's Fourth Amendment rights.[8]

Ellison's other Fourth Amendment claim also fails and warrants only brief discussion. First, the district court did not err in granting summary judgment on Ellison's claim that defendants made a warrantless entry or unlawfully extended their lawful presence in her home. The undisputed summary judgment evidence shows that Ellison consented to the defendants' initial entry into her apartment. Even assuming that Ellison revoked her consent to their presence when she closed and locked the apartment door, leaving the defendants in the hallway, the defendants had both probable cause to believe Ellison was in danger and exigent

---

[8]Ellison also challenges that the manner in which she was seized was objectively unreasonable under the circumstances and violated her Fourth Amendment rights. Specifically, Ellison claims she was seized in an inappropriate manner because (1) when Officer Hobbs held her from behind her breast was exposed while they were in the hallway, (2) her body was again exposed when she was being placed in soft restraints, and (3) she was walked to the ambulance in only a bathrobe and underwear. She asserts that it was clearly established at the time that exposing a female's body in such a manner was unlawful, citing Los Angeles Cty. v. Rettele, 550 U.S. 609, 127 S. Ct. 1989 (2007).

In Retelle, when executing a search warrant, officers entered a bedroom with guns drawn and ordered a man and a woman out of their bed and to show their hands. 550 U.S. at 611, 127 S. Ct. at 1991. The individuals protested that they were not wearing clothes. Id. They both stood up naked and were held at gunpoint for one to two minutes before they were permitted to dress. Id. The Supreme Court held there was no violation of the individuals' Fourth Amendment rights due to the officers' safety concerns, the short duration of their exposure, and the need to secure the scene. Id. at 614-16, 127 S. Ct. at 1993-94. If the Supreme Court in Retelle did not conclude that there was a Fourth Amendment violation, then Retelle could not have clearly established that the defendants' conduct here violated Ellison's Fourth Amendment rights. If anything, Ellison's exposure was inadvertent, as well as more limited and brief.

circumstances to justify their subsequent entry and continued presence.[9]  See id. at

905 (explaining that "[e]mergency situations involving endangerment to life fall

squarely within the exigent circumstances exception" and that "[w]hen officers

respond to an emergency, the probable cause element may be satisfied where

officers reasonably believe a person is in danger").  The emergency nature of the

situation and Ellison's manic and unpredictable behavior and statements, which did

not dissipate during their encounter with her, made it reasonable for the defendants

to believe that she needed immediate assistance.

**B.    Fourteenth Amendment – Violation of State-Created Procedures**

Ellison summarily argues that the defendants violated her right to due

process when they involuntarily transported her to the hospital without following

the prescribed state procedures for involuntary mental evaluation and treatment in

O.C.G.A. § 37-3-40 et seq.  She contends that, as of June 16, 2015, it was clearly

established in the mental health context that depriving a mentally impaired person

of state-created procedural due process rights constituted a deprivation of that

person's liberty interests under the Fourteenth Amendment.[10]

---

[9]The record also shows that Ellison actually waved Officer Hobbs back into her apartment but did also say leave the others outside.  Ellison also allowed Paramedic Gasaway to come in to take her pulse.  In any event, the record contains ample evidence for the officers to believe Ellison was in danger.

[10]Ellison raises this issue for the first time in her reply brief.  We ordinarily do not address issues raised for the first time in a reply brief.  See Big Top Koolers, Inc. v. Circus-Man Snacks, Inc., 528 F.3d 839, 844 (11th Cir. 2008) ("We decline to address an argument advanced

Ellison's due process claim fails because the defendants did not take Ellison into custody in order to take her to a "mental health emergency receiving facility" for involuntary mental health evaluation or treatment under O.C.G.A. §§ 37-3-41 or 37-3-42.  Rather, the defendants responded to a 911 medical emergency call, and Paramedic Gasaway determined that Ellison did not have adequate medical decision making capacity and transported her to a hospital for medical care. Therefore, none of the state-created procedural safeguards in O.C.G.A. §§ 37-3-41 and 37-3-42 for taking persons into involuntary civil custody for purposes of a mental health evaluation or treatment were implicated by the defendants' actions. Furthermore, upon arrival at the hospital, a physician examined Ellison, determined that she was in need of involuntary treatment, and executed the form satisfying O.C.G.A. § 37-3-41.

## VII.  CONCLUSION

For all of these reasons, the district court properly granted summary judgment in favor of Paramedic Gasaway, EMT Howard, Officer Hobbs, Officer Condit, and Sergeant Ayers in their individual capacities on Ellison's Fourth and Fourteenth Amendment claims.

**AFFIRMED.**

---

by an appellant for the first time in a reply brief.").  Here, we exercise our discretion to address Ellison's due process argument because it fails in any event.

37